1  TODD W. BURNS
   California State Bar No. 194937
2  FEDERAL DEFENDERS OF SAN DIEGO, INC.
   225 Broadway, Suite 900
3  San Diego, California  92101-5008
   Telephone No. (619) 234-8467
4  Email: Todd_Burns@fd.org

5  Attorneys for Mr. Cruz

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10                (HONORABLE JANIS I. SAMMARTINO)

11  UNITED STATES OF AMERICA,        )      Criminal No. 08CR1604-JLS
                                     )
12          Plaintiff,               )
                                     )
13  v.                               )      MEMORANDUM OF POINTS AND
                                     )      AUTHORITIES IN SUPPORT OF
14  CATHY LEXIN (2),                 )      DEFENDANT CRUZ'S PRE-TRIAL
                                     )      MOTIONS
15          Defendant.               )
    ─────────────────────────────────)
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     DUE TO THE GOVERNMENT'S FAILURE TO COMPLY WITH RULE 5.1(c)'S TIME
        REQUIREMENT FOR HOLDING A PRELIMINARY HEARING, THE COURT
        SHOULD ORDER MR. CRUZ DISCHARGED FROM CUSTODY . . . . . . . . . . . . . . . . . . . . 1

        A.      Relevant Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      The Magistrate Court Should Have, And Thus This Court Should, Order Mr. Cruz's
                Discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    THE COURT SHOULD SUPPRESS THE FRUITS OF MR. CRUZ'S UNLAWFUL
        SEIZURE AND SEARCH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.      Circumstances Surrounding Mr. Cruz's Seizure And Search . . . . . . . . . . . . . . . . . . . 7

                1.      Preliminary Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                2.      Relevant Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.      The Court Should Suppress All Fruits Of The Search And Seizure, On Numerous
                Bases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                1.      There Was No Reasonable Suspicion For The Initial Terry Seizure . . . . . . . . . 8

                2.      Even If The Initial Terry Stop Were Legal, It Was Impermissibly Extended
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                3.      There Was No Justification For A Terry "Frisk" . . . . . . . . . . . . . . . . . . . . . 9

                4.      Handcuffing Mr. Cruz Before The Terry "Frisk" Was Unreasonably
                        Intrusive, And Escalated The Seizure To An Arrest Without Probable
                        Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

                5.      Seizure Of The Two Boxes Discovered In Mr. Cruz's Socks Was Not
                        Permissible As Part Of A Terry Search . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.     THE COURT SHOULD DISMISS DUE TO THE GOVERNMENT'S FAILURE TO
        PROPERLY CHARGE THE OFFENSE ELEMENTS IN THE INDICTMENT . . . . . . . . . . . 11

        A.      The Indictment Must Charge All Offense Elements . . . . . . . . . . . . . . . . . . . . . . . . 11

        B.      The Government Failed To Charge That Mr. Cruz Had "Been Admitted To The
                United States Under A Non-Immigrant Visa" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                1.      The Relevant Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                2.      The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

//

08CR1604

        3.     The Indictment Fails To Charge That Mr. Cruz "Has Been Admitted Under A Nonimmigrant Visa," As Statutorily Defined . . . . . . . . . . . . . . . . . . . . . . . 12

V.    THE COURT SHOULD SUPPRESS MR. CRUZ'S STATEMENTS DUE TO AN INVALID MIRANDA WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VI.   THE COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE STATUTE CHARGED IS UNCONSTITUTIONAL INFRINGEMENT ON THE RIGHT TO BEAR ARMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VII.  THE COURT SHOULD COMPEL DISCOVERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     A.     Relevant Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     B.     Request That Court Compel Discovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VIII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

INDEX TO EXHIBITS

Certificate of Service

# I.

## **INTRODUCTION**

Defendant Daniel Cruz-Escobar was arrested April 29, 2008; on May 15, 2008, he was charged by indictment with one count of unlawful possession of ammunition.  <u>See</u> 18 U.S.C. §922(g)(5)(B).  According to government-produced discovery, Mr. Cruz, who has a "visa" allowing him to enter the United States, was seized with two boxes of shogun shells (five in each box) hidden in his socks.  Also according to government-produced discovery, Mr. Cruz intended to take those shells to Mexico, where he and his comrades in the Mexican military would use them for sporting and practice purposes.

Below, Mr. Cruz sets outs his reasons why the Court should:  (1) order his discharge, due to the government's failure to proceed with the preliminary hearing as required by Federal Rule of Criminal Procedure 5.1 and 18 U.S.C. §3060; (2) suppress the fruits of his unlawful search and seizure; (3) dismiss because the indictment does not allege all elements of the charged offense; (4) suppress Mr. Cruz's statements due to an invalid <u>Miranda</u> waiver; (5) dismiss because the offense charged is an unconstitutional infringement on Mr. Cruz's Second Amendment right to bear arms; and (6) compel discovery.

# II.

## **DUE TO THE GOVERNMENT'S FAILURE TO COMPLY WITH RULE 5.1(c)'S TIME REQUIREMENT FOR HOLDING A PRELIMINARY HEARING, THE COURT SHOULD ORDER MR. CRUZ DISCHARGED FROM CUSTODY**

The government failed to comply with the deadline for holding a preliminary hearing, as set out in Federal Rule of Criminal Procedure 5.1(c) and 18 U.S.C. §3060.  Accordingly, the Court should order Mr. Cruz's discharge from custody.  Below, Mr. Cruz first sets out the relevant facts, then applies those facts to the law.

//
//
//
//
//
//
//

08CR1604

**A.      Relevant Background**[1]

Mr. Cruz was arrested at the San Ysidro Port of Entry on April 29, 2008 (a Tuesday), was charged in a complaint on April 30, and made his first court appearance on May 1.  At the first appearance, the magistrate judge set the preliminary hearing for May 15 at 9:30 a.m.

On May 9, 2008, government counsel, Randy Jones, called defense counsel to discuss the case.[2] Defense counsel made clear to Mr. Jones, from the very outset, that, if the parties were to settle the case, it would require an agreement to immediate sentencing, and Mr. Cruz was also seeking a time-served government recommendation.  As defense counsel explained, this was because Mr. Cruz is a long-time member of the Mexican army (he is a cook), and his arrest and resulting absence have two serious collateral consequences:  he is considered AWOL, and his military pension is at risk.  Given these concerns, and what defense counsel viewed as the relative lack of seriousness of the charged offense, Mr. Cruz hoped to convince the Court to sentence Mr. Cruz quickly, impose a time-served sentence, and have Mr. Cruz return to Mexico as quickly as possible, in the hope he can salvage his job and/or pension.[3]

Mr. Jones responded to defense counsel by saying he would have to check (presumably with a supervisor) to determine what the government's plea offer would be.  Mr. Jones then asked if Mr. Cruz would be willing to "waive time" at the May 15 hearing; that is, would Mr. Cruz agree to continue the hearing for a couple of weeks to give the government time to decide on its offer.  Defense counsel firmly and explicitly

---

[1]      This background is based largely on interactions between government counsel and defense counsel.  Accordingly, it is supported by a declaration from defense counsel.  (Exhibit A.)  Incidentally, the consistently requests that district court judges deny defense motions without a hearing, based on defendants failing to file declarations, as required by Local Criminal Rule 47.1(g).  Mr. Cruz has supported this pleading with declarations, where appropriate.  Mr. Cruz notes that Rule 47.1(g) also requires the government to file declarations to support any opposition.  Mr. Cruz requests that if the government fails to do so, the Court deem the relevant motions unopposed and grant the requested relief.

[2]      At the outset, undersigned counsel wishes to make clear that by setting out the following history, he is not intending to involve the Court in plea negotiations, which is prohibited by Federal Rule of Criminal Procedure 11(c)(1).  This history is being set out because it is essential background for the motion presented.

[3]      Notably, because of Mr. Cruz's immigration status, if he were to post bond he likely would be picked up and held by immigration.  Thus, a quick resolution of this case was his only hope for limiting the dramatic collateral consequences.

1  rejected that request to waive time.  Defense counsel then reiterated that if this case were to be settled, it

2  would have to be done quickly, as it was mostly the collateral consequences of this case that were motivating

3  Mr. Cruz's inclination to settle.  Defense counsel also made clear to Mr. Jones that absent a prompt settlement,

4  defense counsel was interested in proceeding with various motions, including with respect to the search and

5  seizure, and the Second Amendment right to bear arms.  In short, defense counsel made clear that if the case

6  was going to settle, Mr. Cruz was not interested in drawing the matter out with a "time waiver."  Mr. Jones

7  wrapped up this conversation by saying he would get back to defense counsel, with a proposed settlement,

8  on Monday, May 12.

9        Instead, Mr. Jones got back to defense counsel on Tuesday, May 13.  Mr. Jones indicated he did not

10  yet have an offer, but, based on his reading of the guidelines, he didn't see how he could make a time-served

11  offer.  Defense counsel asked Mr. Jones to determine the best offer the government would make, and defense

12  counsel specifically said that "in a show of good faith," Mr. Cruz would agree to <u>waive indictment</u> on May

13  15.  Defense counsel explained that this would allow Mr. Jones to find out (from his supervisor, presumably)

14  what was the best offer the government would make, while also keeping open the possibility of a fast-track

15  departure, as the government would not have to expend any time or resources taking the matter to the grand

16  jury.  Mr. Jones agreed with that course.  Defense counsel indicated that government counsel would have to

17  send defense counsel a waiver of indictment form, and a copy of the proposed information, quickly (via

18  facsimile), so defense counsel could see Mr. Cruz and review those items before the court appearance on May

19  15.  Mr. Jones agreed to do so.

20        On the morning of May 14, when he anticipated visiting Mr. Cruz, defense counsel had not received

21  the waiver of indictment from Mr. Jones.  Accordingly, defense counsel called Mr. Jones, and left a voicemail

22  message saying was prepared to go visit with Mr. Cruz, and needed the waiver of indictment form and

23  proposed information so Mr. Cruz would be prepared to waive indictment at the May 15 hearing.  Defense

24  counsel again requested government counsel promptly provide those items by facsimile.  After leaving that

25  message, defense counsel chose to prepare his own waiver of indictment form (there was a template for such

26  in Federal Defenders' form directory), then left to the jail to meet with Mr. Cruz, who was advised about what

27  was happening, approved, and signed the waiver of indictment form.  (Exhibit B.)

28  //

1    At about the same time, Mr. Jones having obviously received defense counsel's May 14 voicemail,

2    the government faxed to defense counsel the proposed information and waiver of indictment. (Exhibit C.)

3    In addition, it is apparent Mr. Jones knew what was going to happen on May 15, and that it was not a situation

4    that was contingent on any plea agreement being entered into (a position Mr. Jones seems to have

5    subsequently taken on May 15). This is apparent for two reasons: (1) no deal had even been offered by the

6    government; and (2) Mr. Jones sent over solely the proposed information and indictment waiver form, not

7    a proposed plea agreement.

8    On May 15, when defense counsel arrived at magistrate court, the duty Assistant United States

9    Attorney ("AUSA") didn't have a file-stamped copy of the information, as would be the normal course.

10   Instead, she said she understood Mr. Cruz would be "waiving time" (that is, agreeing to a continuance of the

11   preliminary hearing). Defense counsel said that was not the case, that Mr. Cruz was supposed to be waiving

12   indictment, and an information was to be filed.

13   A few minutes later, Mr. Jones showed up, and he claimed he believed Mr. Cruz was supposed to

14   be "waiving time." Defense counsel was surprised, and told Mr. Jones the agreed plan was that Mr. Cruz

15   would waive indictment that day. Defense counsel reminded Mr. Jones that defense counsel had been clear

16   that if the case were to settle, it must proceed quickly. In addition, defense counsel told Mr. Jones that he had

17   a signed waiver of indictment, and Mr. Cruz was prepared to waive indictment that day. Nonsensically,

18   government counsel insisted that he would not proceed in the manner clearly agreed to, apparently because

19   the parties had not agreed on a plea deal. Defense counsel responded that there had been no agreed to

20   settlement because the government had yet to make an offer, and, regardless, Mr. Cruz's waiving indictment

21   saved the government the time of getting an indictment.[4] Incredibly, Mr. Jones said he would indict Mr. Cruz,

22   told the duty AUSA that, and left court.

23   When the case was called, defense counsel advised the magistrate judge of the above history, noted

24   that Mr. Jones had left and thus, apparently, the government wasn't prepared to proceed with the scheduled

25   preliminary hearing. Accordingly, Mr. Cruz moved for dismissal. The magistrate judge denied that motion,

26

27      [4]    Incidentally, there was, and is, only one potential charge in this case, and that charge was

28   contained in the complaint, in the proposed information, and in the indictment.

08CR1604

1  finding "[i]t appears there was, in fact, a miscommunication of counsel," and "extraordinary circumstances

2  and justice require[d]" continuing the preliminary hearing to May 20.[5]  Mr. Cruz noted his objection.

3  **B.**     **The Magistrate Court Should Have, And Thus This Court Should, Order Mr. Cruz's**
       **Discharge**

4

5          For a felony case, Federal Rule of Criminal Procedure 5.1 requires a magistrate judge hold a

6  preliminary hearing to determine if there is probable cause to proceed.[6]  See Fed. R. Crim. P. 5.1(a) & (c).

7  That hearing must be held "within a reasonable time, but not later than 10 days after the initial appearance

8  if the defendant is in custody," and Mr. Cruz has been in custody since his arrest.  Fed. R. Crim. P. 5.1(c)

9  (emphasis added).  Thus, the latest time a preliminary hearing may be scheduled for is ten days after the initial

10 appearance, which was the course the magistrate judge chose for Mr. Cruz's preliminary hearing.  That the

11 government failed to proceed at that time clearly violated the Rule and the magistrate judge's scheduling

12 order.

13         Section 3060 of Title 18 of the United States Code contains much of the same preliminary hearing

14 requirements as are set out in Rule 5.1.  Section 3060(a) requires that the "preliminary examination shall be

15 held within the time set by the judge or magistrate judge pursuant to subsection (b) . . . ."  (Emphasis added.)

16 Subsection (b) contains the ten day requirement already referred to, from Rule 5.1.  Subsection (d) sets out

17 the remedy for failure to comply with the deadline:  "an arrested person who has not been accorded the

18 preliminary examination required by subsection (a) within the time fixed by the judge or magistrate judge .

19 . . shall be discharged from custody or from the requirement of bail or any other condition of release . . . ."

20 (Emphasis added.)  That is the remedy Mr. Cruz seeks.

21         As set out above, in denying that remedy the magistrate judge said "[i]t appears there was, in fact

22 a miscommunication of counsel," and "extraordinary circumstances and justice require[d]" continuing the

23 preliminary hearing past the statutory deadline.  As an initial matter, there was no miscommunication: the

24 best the government can claim is that Mr. Jones suffered some sort of brain-freeze.

25 //

26 _____

27      [5]     A copy of the May 15 hearing transcript is attached as Exhibit D.

28      [6]     There are exceptions to that requirement, but they don't apply here.

In addition, the magistrate judge's reference to "extraordinary circumstances and justice" is taken from Rule 5.1(d), which allows the magistrate judge to continue a preliminary hearing, without a defendant's consent, "on a showing that extraordinary circumstances exist and justice requires the delay."  Here, there were no extraordinary circumstances, only two "mistakes" by government counsel:  (1) his "forgetting" that to which the parties clearly agreed; and (2) his completely utterly inexplicable choice to go get an indictment, rather than accept the waiver of indictment.  These circumstances were extraordinary, but not in the sense contemplated by Rule 5.1(d).

Moreover, at base the government's reason for not proceeding with the scheduled preliminary hearing, and thus essentially requesting a continuance, was so that it could go get an indictment.  As the Second Circuit has noted, this is exactly the type of situation that does not amount to an extraordinary circumstance:  "[T]he time limits in Rule 5(c) and the strict 'extraordinary circumstances' standard for granting continuances were added to the Rule in 1972 to prohibit the practice in some districts of routinely granting a continuance to allow the government to satisfy the probable cause requirement by filing an indictment."  United States v. Guray, 793 F.2d 468, 472 (2d Cir. 1986).

In addition, the interest of justice also compels discharge.  First, the date set for the hearing was at the very outer limits allowed by law, yet the government still didn't comply.  Second, Mr. Cruz was arrested on April 29, at the San Ysidro Port of Entry, but was not promptly brought to court, some twenty miles away, until May 1, in contravention of Rule 5(a)(1)'s requirement that the person be brought before a magistrate judge "without unnecessary delay."  The record does not reveal any good reason for the government's delaying Mr. Cruz's appearance by one day, and if he had been brought to court a day earlier, the outer limit for his preliminary examination would have been May 14, not May 15.  Thus, the government's delaying actions counsel for the discharge remedy.

**III.**

**THE COURT SHOULD SUPPRESS THE FRUITS OF
MR. CRUZ'S UNLAWFUL SEIZURE AND SEARCH**

**A.     Introduction**

Mr. Cruz moves to suppress the fruits of his unlawful seizure and search.  The specific arguments are as follows:  (1) there was not reasonable suspicion for the initial Terry-stop; (2) if the initial Terry-stop

1  was valid, its scope was impermissibly extended; (3) there was no justification for the <u>Terry</u> search;

2  (4) handcuffing Mr. Cruz before the <u>Terry</u> search was unreasonable; and (5) seizure of the two boxes found

3  in Mr. Cruz's socks was not permissible as part of a <u>Terry</u> search.

4  **B.     Circumstances Surrounding Mr. Cruz's Seizure And Search**

5       **1.     Preliminary Concerns**

6       Before setting out the events surrounding Mr. Cruz's arrest, there are a few things worth noting.

7  First, defense counsel has made repeated discovery requests of government counsel, and specifically

8  requested production of any video relating to Mr. Cruz's arrest, and a map, or at least indication, of where the

9  arrest occurred.  This request was made so defense counsel could better understand the narrative in the two

10 reports produced by the government in discovery.  Defense counsel's repeated requests have been met with

11 silence.

12      Second, undersigned counsel's attempt to set out the circumstances surrounding Mr. Cruz's seizure

13 and search, from the relevant officers' perspectives, has proven difficult given the nature of the two reports

14 produced.  One report is the Report of Investigation ("ROI") by Immigration and Customs Enforcement

15 ("ICE") Agent Gonzalez (Exhibit E).  The other is a report by Border Patrol Agent Dailey (Exhibit F).  The

16 reports contain a number of conflicting statements, and the lack of a report from Border Patrol Agent

17 Desrosiers, who made initial observations of Mr. Cruz, is both surprising and makes difficult understanding,

18 and crediting, Agent Dailey's hearsay recitation of those observations.

19      With these caveats in mind, Mr. Cruz sets out why the agents claimed to have arrested Mr. Cruz, and

20 what they did.

21      **2.     Relevant Events**

22      According to the agent reports attached as Exhibits E and F, on April 29, 2008 Border Patrol Agents

23 set up an out-bound inspection checkpoint at the San Ysidro Port of Entry, near pedestrian turnstiles that

24 entered into Mexico.  Most of the agents were in uniform, with police vests and badges visible.  Border Patrol

25 Agent Desrosiers was in plainclothes, and was observing people in the area.

26      At about 1:10 p.m., Agent Desrosiers saw Mr. Cruz walking away (*i.e.*, North) from the checkpoint,

27 and looking back toward the checkpoint.  Mr. Cruz took a seat on a bench about forty yards from the

28 checkpoint, and over the next ten minutes Mr. Cruz looked over his shoulder "numerous times," looking

1  toward the pedestrian entrance to Mexico.  During that time, Agent Desrosiers observed Mr. Cruz talk to

2  another man.  After about ten minutes, Mr. Cruz got up and walked around, then returned to the bench.  After

3  a few minutes, Mr. Cruz got up and walked around again, spoke to another man, and again returned to the

4  bench.  Agent Desrosiers thought Mr. Cruz seemed nervous, and he reported his observations to Border Patrol

5  Agent Dailey.

6        According to Agent Dailey's report, he and Border Patrol Agent Blas approached Mr. Cruz,

7  identified themselves, and asked Mr. Cruz his immigration status.  Mr. Cruz showed the agents his valid

8  border crossing card.  The agents then asked Mr. Cruz where he was going, and he replied to Mexico.  Agent

9  Blas asked Mr. Cruz why he was waiting to enter Mexico, and Mr. Cruz, according to Agent Dailey's report,

10  "gave an evasive answer, and then stated that he stated [sic] he was waiting for a friend."  Agent Dailey then

11  asked Mr. Cruz what was in his bags, and Mr. Cruz shrugged.  Agent Dailey then asked to look in Mr. Cruz's

12  bags, and Mr. Cruz agreed.  In two plastic grocery bags, Mr. Cruz had two boxes of ice cream bars.  A

13  children's backpack he was carrying contained nothing.  According to Agent Dailey's report, Agent Dailey:

14        [N]oticed that Cruz was becoming visibly nervous and agitated, [and Agent Dailey] told
       Cruz to stand up and put his hands against the wall for a Terry Frisk, for officer safety.

15        Cruz immediately became stiff and rigid; at that point Agent Dailey placed Cruz in
       handcuffs for safety.  A search of Cruz revealed two boxes of Winchester 12 gauge

16        buckshot, 5 per box, one box per sock.

17  **C.    The Court Should Suppress All Fruits Of The Search And Seizure, On Numerous Bases**

18        As set out above, there are numerous bases to suppress here.  Mr. Cruz will go through those in the

19  order set out in the introduction to this section of the memorandum.

20        **1.    There Was No Reasonable Suspicion For The Initial <u>Terry</u> Seizure**

21        When Agents Dailey and Blas initially confronted and questioned Mr. Cruz, he was seized.  <u>See</u>

22  <u>Terry v. Ohio</u>, 392 U.S. 1, 17 (1968) ("It must be recognized that whenever a police officer accosts an

23  individual and restrains his freedom to walk away, he has 'seized' that person").  Under <u>Terry</u>, that seizure

24  required reasonable suspicion.  That suspicion was lacking here.  Mr. Cruz's actions were completely

25  consistent with a person who is waiting for someone to arrive, and is walking around looking for that person.

26  Moreover, the government can hardly claim Mr. Cruz appeared to be avoiding the checkpoint, as he stayed

27  in the area of the checkpoint, and even walked very close to it when he was walking around.

28  //

### 2.     Even If The Initial <u>Terry</u> Stop Were Legal, It Was Impermissibly Extended

Even assuming there was reasonable suspicion for the initial <u>Terry</u> seizure, that seizure was unlawfully prolonged.  <u>See</u> <u>Terry</u>, 392 U.S. at 19-20 (holding that assessment of whether "the seizure and search were 'unreasonable' [is a dual inquiry] -- whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place"); <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983) (holding that scope of an investigative detention "must be carefully tailored to its underlying justification . . . and [may] last no longer than is necessary to effectuate the purpose of the stop").

Mr. Cruz was completely cooperative with the agents (and provided them his border crossing card), he was not excessively nervous given that he was being confronted by two law enforcement officers,[7] and consistent with his behavior he explained to them he was waiting for a friend.  After this exchange, the agents should have broken off the encounter.

The Ninth Circuit's holding in <u>United States v. Chavez-Valenzuela</u>, 268 F.3d 719 (9th Cir. 2001), is directly on point.[8]  There, the Court held that extending a <u>Terry</u>-stop based on a person's appearing nervous -- the only factor in play here -- is impermissible:

> On balance, we find convincing the reasoning of our sister circuits as to the relevance of nervousness as a factor creating reasonable suspicion.  Encounters with police officers are necessarily stressful for law-abiders and criminals alike.  We therefore hold today that nervousness during a traffic stop -- even the extreme nervousness Chavez-Valenzuela exhibited here -- in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity, and does not justify an officer's continued detention of a suspect after he has satisfied the purpose of the stop.

Thus, once Mr. Cruz explained what he was doing in the area, and provided his border crosser card, the agents should have broken off the encounter.

### 3.     There Was No Justification For A <u>Terry</u> "Frisk"

There was no justification for a <u>Terry</u> search.  "A search for weapons incident to a <u>Terry</u> stop is also assessed for whether the officer had a reasonable, particularized suspicion that the individual was armed."

---

[7]     This is supported by Mr. Cruz's declaration, attached as Exhibit G.

[8]     As noted in <u>United States v. Mendez</u>, 476 F.3d 1077, 1080 (9th Cir. 2007), the holding of <u>Chavez-Valenzuela</u> has been limited, but not in any way relevant to this case.

1  United States v. Hubbell, 167 F.3d 552, 580 n.34 (D.C. Cir. 1989); see also Terry, 392 U.S. at 24 (holding

2  that officer must have particularized suspicion that the person whose "behavior he is investigating at close

3  range is armed and presently dangerous to the officer or to others"); see id. at 27 (same).  Here, Mr. Cruz did

4  nothing to indicate he might have a weapon, or was a threat in any way.  See Dec. of Daniel Cruz (Exhibit G).

5  He had been completely cooperative with the agents (including allowing them to search his bags), he was

6  sitting down, and he is a rather small man.

7          **4.      Handcuffing Mr. Cruz Before The Terry "Frisk" Was Unreasonably Intrusive, And
                      Escalated The Seizure To An Arrest Without Probable Cause**
8

9          When Agent Dailey handcuffed Mr. Cruz, the "encounter" clearly amounted to an arrest.  Because

10  there was not probable cause for such, the seizure was unlawful, and its fruits should be suppressed.

11          In Washington v. Lambert, 98 F.3d 1181 (9th Cir. 1996), the Ninth Circuit addressed the distinction

12  between an arrest (requiring probable cause) and a Terry seizure.  In making that distinction, the court said

13  it is appropriate to evaluate how intrusive the stop was and the nature of the police methods used under the

14  circumstances.  "The relevant inquiry is always one of reasonableness under the circumstances."  Allen v.

15  City of Los Angeles, 66 F.3f 1052, 1057 (9th Cir. 1995).  Because the Court considers the intrusiveness of

16  the police action versus the danger presented, pointing a weapon at a suspect, handcuffing him, or putting him

17  in a police car will not automatically constitute an arrest.  Lambert, 98 F.3d at 1186.

18          However, "[u]nder ordinary circumstances, when the police have only reasonable suspicion to make

19  an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth

20  Amendment. . . .  In fact, even markedly less intrusive police action has been held to constitute an arrest when

21  the inherent danger of the situation does not justify the intrusive police action."  Id. at 1187.  The Court in

22  Lambert went on the note that handcuffing and physical restraint (such as detaining a suspect in a car) are the

23  sorts of intrusive methods that police in Terry-stop situations may only employ if they have specific

24  information that leads them to believe the suspect presents a risk of danger or flight.  Id. at 1188-89.  In

25  addition, the number of other officers around is relevant to determine the danger posed, and thus the

26  reasonableness of the methods used.

27  //

28  //

1   Here, there were two agents standing over the seated Mr. Cruz, the agents had no specific

2   information that Mr. Cruz presented any risk, and there were many other agents nearby, who were blocking

3   the only real hope for escape.  Under these circumstances, use of the handcuffs was unreasonable.

4   **5.   Seizure Of The Two Boxes Discovered In Mr. Cruz's Socks Was Not Permissible As Part Of A <u>Terry</u> Search**

5

6   The search authorized by <u>Terry</u> is not unlimited in breadth.  As the Court noted in <u>Terry</u>, "[e]ven a

7   limited search of the <u>outer</u> clothing for weapons constitutes a severe, though brief, intrusion upon cherished

8   personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." 392

9   U.S. at 24-25 (emphasis added).  Accordingly, the Court in <u>Terry</u> recognized a "narrowly drawn authority

10  to permit a reasonable search for weapons for the protection of the police officer . . . ." <u>Id.</u> at 27.  <u>Terry</u>

11  indicates that such a search must be limited to the "outer clothing" of a person, unless and until the officer

12  feels a weapon.  <u>See id.</u> at 29-30.

13  These standards did not permit Agent Dailey's seizure of the two boxes he "felt" in Mr. Cruz's socks.

14  Although the government has not produced discovery on this issue, undersigned counsel understands the

15  boxes are approximately the size of a pack of cigarettes.  Simply touching those boxes, outside Mr. Cruz's

16  pants, could not have given rise to the belief that they were concealed weapons.  Thus, pulling up Mr. Cruz's

17  pants, and removing the boxes, was not permissible under <u>Terry</u>.

18  **IV.**

19  **<u>THE COURT SHOULD DISMISS DUE TO THE GOVERNMENT'S FAILURE TO PROPERLY CHARGE THE OFFENSE ELEMENTS IN THE INDICTMENT</u>**

20

21  An indictment must allege all elements of the offense charged, for the primary reason that doing so

22  insures the grand jury has passed on all those elements, which it must.  Here, the government failed to charge

23  an element of 18 U.S.C. §922(g)(5)(B).  Mr. Cruz first sets out the law, then applies it to the indictment.

24  **A.   The Indictment Must Charge All Offense Elements**

25  It is black letter law that the government must properly charge the offense elements in the

26  indictment, otherwise the grand jury may not have found the necessary elements to indict.  <u>See, e.g.</u>, <u>Stirone</u>

27  <u>v. United States</u>, 361 U.S. 212, 217 (1960); <u>United States v. Hess</u>, 124 U.S. 483 (1888); <u>United States v. Carll</u>,

28  105 U.S. 611 (1881); <u>United States v. Omer</u>, 395 F.3d 1087, 1088 (9th Cir. 2005) (failure to charge element

1   is structural error, thus not subject to plain error review); <u>United States v. DuBo</u>, 186 F.3d 1177, 1179 (9th

2   Cir. 1999) (implied element must be charged in indictment). "If an element is necessary to convict, it is

3   also necessary to indict, because elements of a crime do not change as criminal proceedings progress." <u>United</u>

4   <u>States v. Hill</u>, 279 F.3d 731, 741 (9th Cir. 2002).

5   **B.    The Government Failed To Charge That Mr. Cruz Had "Been Admitted To The United States**
    **Under A Non-Immigrant Visa"**

6

7       **1.    The Relevant Statute**

8       The statute charged, 18 U.S.C. §922(g)(5)(B), states, in relevant part:

9       (g)  It shall be unlawful for any person --

10          (5)  who, being an alien --

11              (B)  except as provided in subsection (y)(2), <u>has been admitted to the United States</u>
                <u>under a nonimmigrant visa</u> (as that term is defined in section 101(a)(26) of the

12              Immigration and Nationality Act (8 U.S.C. 1101(a)(26));

13      to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any
        firearm or ammunition . . . .

14

15  (Emphasis added.)  Thus, it is clear that one of the offense elements is that Mr. Cruz "has been admitted to

16  the United States under a nonimmigrant visa," as such a visa is defined by statute.

17      **2.    The Indictment**

18      The indictment reads as follows:

19      On or about April 29, 2008, within the Southern District of California, defendant Daniel
        Cruz-Escobar, an [sic] <u>non-immigrant alien in the United States</u>, did knowingly and

20      unlawfully possess, in and affecting commerce, ammunition, that is, two boxes of
        Winchester 12 gauge shotgun ammunition; all in violation of Title 18, United States Code,

21      Sections 922(b)(5)(B) and 924(a)(2).

22      **3.    The Indictment Fails To Charge That Mr. Cruz "Has Been Admitted Under A**
            **Nonimmigrant Visa," As Statutorily Defined**

23

24      As indicated, the indictment charges Mr. Cruz is a "non-immigrant alien in the United States."  It

25  does not charge the element that Mr. Cruz "has been admitted to the United States under a nonimmigrant

26  visa," as defined by statute.  Accordingly, the indictment fails to charge an element of the offense, and must

27  be dismissed.

28  //

## V.

### THE COURT SHOULD SUPPRESS MR. CRUZ'S STATEMENTS
### DUE TO AN INVALID MIRANDA WAIVER

Mr. Cruz made post-arrest statements immediately following his arrest, and additional statements later in an interview room.  Agents advised Mr. Cruz of his Miranda rights before both sets of statements.  However, Mr. Cruz moves to suppress both sets of statements because his Miranda waiver was not knowing, intelligent, and voluntary.

To begin with, the Court must "indulge every reasonable presumption against waiver of fundamental constitutional rights." United States v. Garibay, 143 F.3d 534, 536-37 (9th Cir. 1998).  In Garibay, the Court held that a Miranda waiver was invalid because the defendant "was not aware of the nature of the constitutional rights he was abandoning." Id. at 537.  Among other things, the Court based this holding on the defendant's "low verbal IQ," language difficulties, and borderline mental retardation.  See id. at 537-38.  In addition, the Court considers whether the defendant has prior experience with the criminal justice system.  See id. at 538.

From defense counsel's perspective, Mr. Cruz appears to have an extremely limited mental capacity.  For example, explaining the concept of waiving indictment, and trying to get Mr. Cruz to understand that concept, was torturous.  That same inability to understand is apparent from the videotape of agents explaining the Miranda rights to Mr. Cruz, and trying to get him to waive them.  The Court should review that video itself, although it is in Spanish, so counsel is not sure how the Court would like to do so.[9]  Finally, in his declaration attached as Exhibit G, Mr. Cruz affirms, among other things, that he is not familiar with the United States justice system, and did not appreciate that he could seek the assistance of an attorney before giving any statement.  As the videotape makes clear, he also did not seem to appreciate that an attorney would be provided for him by the Court; rather, he seemed to think the attorney would be a member of the same agency as the arresting officers.

//

---

[9]    It seems the most appropriate course would be for the Court to review the videotape in Court, with the assistance of a court-certified interpreter.  Alternatively, defense counsel could have a copy of the relevant portion of the tape prepared, with English sub-titles, but preparing that takes significant time.

1  Accordingly, because the government cannot meet its burden of showing a knowing, intelligent, and

2  voluntary waiver of <u>Miranda</u> rights, the Court should suppress any post-arrest statements.

3  **VI.**

4  **THE COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE STATUTE CHARGED
   IS AN UNCONSTITUTIONAL INFRINGEMENT ON THE RIGHT TO BEAR ARMS**

5

6  The Second Amendment to the United States Constitution provides: "A well regulated Milita, being

7  necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

8  For many years, courts have construed this amendment as not providing an individual right to bear arms, but

9  rather a right connected to a State militia.

10  However, in a case now pending in the Supreme Court, <u>District of Columbia v. Heller</u>, S. Ct. Case

11  No. 07-290, the issue of whether the Second Amendment confers an individual right is central.  The case was

12  argued on March 18, 2008, and, from what was reported about the tenor of the argument, it seems likely the

13  Supreme Court will find there is an individual right to bear arms.  Naturally, that will have a profound effect

14  on many of this nation's laws prohibiting, or restricting, possession of arms.  Mr. Cruz's position is that if he

15  has such a fundamental right, strict scrutiny will likely apply, and the application of 18 U.S.C. §922(g)(5)(B)

16  to him will not survive that review.

17  Given that the Supreme Court should issue its opinion in <u>Heller</u> by the end of this month (June

18  2008), it does not seem useful to brief the issue now.  Accordingly, Mr. Heller raises this basis for dismissal

19  now, and requests leave to brief the issue more fully once <u>Heller</u> is filed.

20  **VII.**

21  **THE COURT SHOULD COMPEL DISCOVERY**

22  Mr. Cruz requests that the Court compel the discovery set out below.

23  **A.**     **Relevant Background**[10]

24  Mr. Cruz made his first court appearance on May 1, 2008, and Federal Defenders was assigned.  On

25  May 2, undersigned counsel reviewed the complaint (the only "discovery" available), and met with Mr. Cruz.

26  //

27  _____

28     [10]     This background is supported by the declaration of undersigned counsel.  (Exhibit A.)

1   It was quickly apparent there would be motions to file based on the search and seizure, and undersigned

2   counsel wanted preserved all objective evidence thereof.

3          Recognizing that surveillance video is often recorded "over" after a short time, undersigned counsel

4   went to magistrate court shortly before the new complaints calendar was called on May 2.  Undersigned

5   counsel requested that the Federal Defenders duty attorney ask that Mr. Cruz's matter be added-on to the

6   calendar, and that the duty attorney make a request for preservation of evidence, including any video of the

7   search and seizure at the border.  The Federal Defenders duty attorney made that request on May 2.  In

8   response, Magistrate Judge Stormes required Mr. Cruz to submit a written motion.  See Clerk's Docket Sheet

9   at 8 (Exhibit H).  Given the late  Friday hour that this order was made, defense counsel filed that motion first

10  thing Monday morning, May 5.  See id. at 7.  Magistrate Judge Stormes signed the order on May 7.  See id.

11  at 9.

12         Acting on a parallel track, on May 2 undersigned counsel also sent faxed a letter to AUSA Charlotte

13  Kaiser; Ms. Kaiser was government counsel when Mr. Cruz made his initial appearance on May 1.  That letter

14  asked that Ms. Kaiser act promptly to preserve any evidence, including any video evidence relating to the

15  seizure and search; undersigned counsel made clear that he believed such evidence to be relevant to

16  suppression motions.

17         Subsequently, undersigned counsel has written three additional discovery-related letters to Mr.

18  Jones, with no response.[11]  At this point, the government has produced copies of the two agent reports

19  discussed above (and attached as Exhibits E and F), papers Mr. Cruz possessed when arrested, a rap sheet

20  (showing no criminal record), some booking-related documents, and a video of Mr. Cruz's interrogation.

21  **B.      Request That Court Compel Discovery**

22         Mr. Cruz requests the Court compel immediate production of the following discovery, most of which

23  has already been specifically requested from the government.

24         First, any evidence relating to his search and seizure, including any reports (including from Agent

25  Desrosiers), audio and video recordings, and photographs of items seized (including the shotgun shells and

26  the boxes in which they were packaged, which should be photographed in a manner that allows the Court and

27

28         [11]      The letters to Ms. Kaiser and Ms. Jones are all included as Exhibit I.

1  counsel to discern their  size).  If the government claims any such evidence has been destroyed, it should

2  explain why.

3      Second, a map, or overhead photo, showing where the seizure occurred.  As undersigned counsel

4  wrote to Mr. Jones on May 23, defense counsel hoped to have that information, and visit the site, prior to

5  filing these motions.

6      Third, any photos of Mr. Cruz following his arrest.

7  **VIII.**

8  **<u>CONCLUSION</u>**

9      Mr. Cruz requests that the Court grant the motions set out above.

10      Respectfully submitted,

11

12 Dated:  June 6, 2008                    */s/ TODD W. BURNS*
                                          TODD W. BURNS
13                                         Federal Defenders of San Diego, Inc.
                                          Attorneys for Mr. Cruz
14                                         Todd_Burns@fd.org

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDEX TO EXHIBITS

EXHIBIT A   Declaration of Todd W. Burns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

EXHIBIT B   Waiver of Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

EXHIBIT C   Information with Waiver of Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

EXHIBIT D   Transcript of PE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

EXHIBIT E   ICE ROI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

EXHIBIT F   BP Report of Apprehension or Seizure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

EXHIBIT G   Declaration of Daniel Cruz-Escobar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

EXHIBIT H   Docket Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

EXHIBIT I   Correspondence to AUSA's Kaiser and Jones . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**CERTIFICATE OF SERVICE**

Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of information and belief, and that a copy has been caused to be delivered this day upon:

1 Courtesy Copy to Honorable Janis L. Sammartino

1 Copy via CM/ECF to Randy Jones, Assistant U.S. Attorney

Dated:  June 6, 2008                          /s/ Todd W. Burns
                                              TODD W. BURNS
                                              Federal Defenders of San Diego, Inc.
                                              225 Broadway, Suite 900
                                              San Diego, CA 92101-5030
                                              (619) 234-8467  (tel)
                                              (619) 687-2666  (fax)
                                              e-mail: todd_burns@fd.org